**Samuel B. PETERS, Appellant,**

v.

**Francis R. SMITH, Collector of Internal Revenue, United States of America, Intervenor.**

**No. 11473.**

United States Court of Appeals, Third Circuit.

Argued Feb. 9, 1955.

Decided April 11, 1955.

William P. Thorn, Philadelphia, Pa. (Joseph W. Price, 3rd, Sanford D. Beecher, Duane, Morris & Heckscher, Philadelphia, Pa., on the brief), for appellant.

Kurt W. Melchior, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Hilbert P. Zarky, Sp. Assts. to Atty. Gen., W. Wilson White, U. S. Atty., Norman Kron, Asst. U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The appellant Peters brought this action against the Collector of Internal Revenue to recover an alleged overpayment of 1946 income tax in the amount of $13,108.39. Answering special interrogatories, a jury found for the plaintiff. But notwithstanding the verdict, the court entered judgment for the Collector. The primary question here is whether the evidence created a jury issue on appellant's contention that certain payments by his former employer constituted gifts to him rather than taxable income.

There is no dispute as to the series of events which created this controversy. Appellant worked for a large department store for 41 years until 1942, at which time the employer terminated his employment because it felt that appellant was no longer able to perform his heavy duties as superintendent of delivery. The employer informed him that it would

pay him a $25 a week "pension" for the rest of his life. It did pay him $25 each week until January, 1946 when, at a time of high profits, the employer decided to purchase annuities to meet future payments to appellant and other former employees. In order to assure appellant a monthly income of $108.33, an approximation of $25 a week, the employer purchased for him a single-payment annuity and in addition made a check to his order for $13,050, a sum calculated to pay appellant's 1946 income tax on the value of the annuity and on the amount of the check itself. The employer caused appellant to endorse the check and then deposited it to appellant's account with the Collector of Internal Revenue as a payment of 1946 income tax. Appellant subsequently filed a tax return for 1946 which did not include as income the cost of the annuity contract or the $13,050. Accordingly, the Collector refunded most of the $13,050 to appellant. But, on further consideration of the matter, appellant filed an amended return for 1946 showing receipt of the annuity and the $13,050, and returned his refund to the Collector.

Thereafter, appellant brought this suit for refund of the tax paid on the annuity and on the $13,050 claiming that both payments were gifts within the meaning of Section 22(b) (3) of the Internal Revenue Code, 26 U.S.C. § 22(b) (3), and as such exempt from income taxation. The case was submitted on special interrogatories to a jury which found that both the annuity and the $13,050 were gifts. The trial judge granted a defense motion to set aside the jury's findings and entered judgment for the Collector. 123 F.Supp. 711. This appeal followed.

■ In asserting that the payments in question were taxable income the government does not contend that the employer was under any legal obligation to pay this "pension". Such cases are difficult because some gratuitous awards of this type are taxable to the recipient as voluntary payments of additional compensation for past services while others are held to be gifts, tax free under Sec-

tion 22(b) (3) of the Internal Revenue Code. The parties here agree upon the general basis of distinction. It is stated very clearly, although in a dissenting opinion, by Mr. Justice Brandeis in Bogardus v. Commissioner, 1937, 302 U. S. 34, 45, 58 S.Ct. 61, 66, 82 L.Ed. 32:

" * * * the categories of 'gift' and 'compensation' are not always mutually exclusive but at times can overlap. What controls is not the presence or absence of consideration. What controls is the intention with which payment, however voluntary, has been made. Has it been made with the intention that services rendered in the past shall be requited more completely, though full acquittance has been given? If so, it bears a tax. Has it been made to show good will, esteem, or kindliness toward persons who happen to have served, but who are paid without thought to make requital for the service? If so, it is exempt."

Our problem is the application of this controlling distinction to the facts of this case.

We observe at the outset that the change from the employer's original procedure of direct weekly "pension" payments out of current funds to a single payment purchase of an annuity for the former employee is not significant for the solution of our present problem. While the employer's purpose was to save money in the long run, its intent toward appellant was to maintain substantially unchanged the benefit he had been receiving under the superseded procedure. Therefore, the circumstances of the original award are determinative of this controversy.

■ We also recognize that as plaintiff in this case the taxpayer had the burden of proof on his claim that the "pension" provided for him was a gift. Moreover, the providing of regular continuing payments of the pension type to employees separated for age or disability after long service has become so widely recognized as a fair and reasonable, even if voluntary, way of requiting past serv-

**724**

ices that some inference of compensatory intention may ordinarily be drawn from the very fact that such provision has been made. While we would not stress this inference as much as the trial judge did in calling it a "strong presumption", we recognize its basis in ordinary experience. At the same time, the possibilities of countervailing indicia of intent are as varied as the circumstances of individual cases.[1] Here several things might have indicated a donative intent to the jury.

█ Although the employer operated a large store and regularly employed hundreds of persons, it had not systematized or standardized retirement policies and practices. Its treasurer testified: "We have no pension plan. We have nothing that we tell our employees, we have nothing that qualifies as a pension plan under the so-called pension plan in the income tax laws." There is no indication that the board of directors had adopted any rules or regulations on the subject. There was no resolution or formal minute concerning appellant's status on separation. Responsible officers of management, exercising wide discretion, dealt with each case on an individual basis. Length of service, position and salary were "taken into consideration * * * up to a point," the treasurer testified. The lower-paid employees were usually given a larger pension in relation to salary than the higher-paid. The earning power of the employee at the time of separation was also a factor. This individualized procedure without any formula gearing payments after separation to salary or length of service might reasonably have impressed the jury as a significant indication that the employer was evidencing good will rather than measuring fair compensation.

It might also have been regarded as relevant that regardless of an employee's age, the employer would not pension him so long as he was deemed competent to perform any available work assignment. As to this the treasurer was explicit:

"We do not pension people on age whatsoever. It isn't length of service and age; if a person can work he stays with us until he dies, because we believe that most people do not want to be shelved, and that is our point of view right along. In other words, we have no pension plan of retiring people unless they are unable physically or mentally, or because of the tough requirements of the job to do their job, and then we try to move them to another job, if possible."

This policy of not permitting a veteran employee to retire with pay so long as it was to the employer's advantage to continue his employment could have been construed as some indication that the idea of earned retirement compensation was not central in the employer's thinking.

That possible inference may have been strengthened by testimony that, in determining the amount to be paid appellant upon termination of his employment, the employer took into account as a minimizing factor its best estimate of the small continuing earning power which he retained despite his unfitness for the work he had been doing. Possible earnings through other employment may be viewed as irrelevant to a determination of the fair requital of past service. But need is a major consideration in deciding the amount of a philanthropic award. Compare the concern of the employers with the living requirements of a former employee or his family in Mutch v. Commissioner, supra, and Alice A. Macfarlane, 1953, 19 T.C. 9.

On the other hand, beyond the already mentioned presumption of compensatory intent, the trial judge indicated that he was influenced by the fact that both employer and employee, particularly the employer in making the $13,050 pay-

---

1. See, for example, Mutch v. Commissioner, 3 Cir., 1954, 209 F.2d 390; Schall v. Commissioner, 5 Cir., 1949, 174 F.2d 893.

ment, revealed a belief that the pension was taxable gain to the employee. But such evidence is not conclusive. Cf. Ruth Hahn, 1954, 13 T.C.M. 308. Not even to courts below the highest, much less to employers and their counsel, is an unimpeachable view of taxable categories to be attributed,[2] especially where it is necessary to make vague distinctions between kinds of voluntary payments, some taxable and others tax free.[3]

As we view the record, the employer in providing the questioned payments did not indicate unequivocally whether such action was intended as additional compensation for past services, or merely as an expression of a philanthropic attitude, or as a bid for employee good will, or as some combination of these. Therefore, "it was for the triers of the facts to seek among competing aims or motives the ones that dominated conduct." See Brandeis, J., in Bogardus v. Commissioner, supra, 302 U.S. at page 45, 58 S.Ct. at page 66.

There remains one other matter. The trial judge ruled on two motions after verdict. In addition to granting the motion for judgment notwithstanding the verdict, he ruled that a motion for new trial should be granted if, on appeal, it should appear that judgment n. o. v. was erroneous. This dual ruling was his prerogative. Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147; Marsh v. Illinois Central Ry. Co., 5 Cir., 1949, 175 F.2d 498. He was convinced that even if technically there was enough evidence to go to the jury, the preponderance of evidence was so favorable to the defendant as to justify the granting of a new trial. This is an area in which a trial judge enjoys very broad discretion. We cannot say that the trial judge acted arbitrarily in the circumstances of this case.

Accordingly, the judgment for the defendant will be reversed and the cause remanded for further proceedings consistent with this opinion.

2. See, most recently, Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 813, 75 S.Ct. 50, holding erroneous the view of this court, 211 F.2d 928, that sums awarded as punitive damages do not constitute taxable income.

3. Of course a gift may be business expense and as such a legitimate deduction in the donor's income tax computation.